UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHELLE MELENDEZ,

        Plaintiff,

     -against-

COUNTY OF WESTCHESTER, WESTCHESTER
COUNTY DEPARTMENT OF CORRECTIONS
SUPERIOR OFFICE, and KEVIN CHEVERKO,
*individually and in his official capacity,*

        Defendants.

| USDC SDNY |
|---|
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: __2/8/2021_____ |

17-cv-9637 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

On December 7, 2017, Plaintiff Michelle Melendez ("Plaintiff" or "Melendez"), a former Correctional Officer ("CO" or "officer") trainee at the Westchester County Department of Corrections Superior Office ("WCDCS"), commenced this action alleging, inter alia, that the County of Westchester, Westchester County Department of Corrections Superior Office ("DOC" or "the Department"), and Commissioner Kevin Cheverko ("Commissioner Cheverko") (collectively, "Defendants") discriminated and retaliated against her following an incident during which she was sexually assaulted by an inmate. Currently before the Court is Defendants' motion seeking summary judgment on Plaintiff's remaining claims of (1) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and (2) violation of equal protection under 42 U.S.C. § 1983 ("Section 1983").[1] (ECF No 70.) For the reasons that follow, the motion for summary judgment is GRANTED in favor of Defendants.

---

[1] The Court previously dismissed Plaintiff's claims for sex-based discrimination and retaliation under New York State law (ECF No. 45); her claims for disability-based discrimination and retaliation under the American Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq.*, and New York State law; sex-based discrimination under Title VII; tortious interference under New York State Law; and Section 1983 based on a due process violation (ECF No. 42).

# BACKGROUND

## 1. Department of Corrections Policies & Practice

The DOC Commissioner—Commissioner Cheverko during the relevant period—has the statutory appointment authority for the Department, meaning that the Commissioner decides who to hire and fire. (Ex. 1 to Adin Decl. ("Cheverko Aff.") ¶ 4 (ECF No 71-1).) New employees are required to serve a twelve to fifty-two-week probationary period during which they may be terminated at any time for unsatisfactory performance; following the expiration of a probationary period, an employee's appointment becomes permanent. (Ex. 3 to Adin Decl. (ECF No. 71-10); Defendants' Rule 56.1 Statement ("Defs' SUMF") ¶ 2 (ECF No. 72); Local Rule 56.1 Counter-Statement of Disputed Material Facts ("Pl.'s CSDMF") ¶ 2.)

The DOC Code of Conduct provides in relevant part that officers "shall not engage in any discourteous, profane, or prejudicial language in oral or written communication with inmates, employees, superiors or members of the public during the performance of his/her official duties" and that "[a]ny alleged violation(s) of the Department's Code of Conduct shall be referred to the Special Investigations Unit (SIU) for an investigation and report to the Commissioner of Correction." (Ex. 13 to Adin Aff. (ECF No. 71-28).)

The Code of Conduct also provides that officers shall not use "unnecessary or excessive force under any circumstances." (*Id.*) When force is used against an inmate, the officers involved must complete a Use of Force Report. (Cheverko Aff. ¶ 7.) Such reports indicate all of the officers present during the incident and which specific officers used force. (Ex. A to Mendoza Aff. ("Pietranico Dep.") at 27 (ECF No. 77-2).) Those reports are reviewed by the Use of Force Review Board ("UOFRB"), which considers whether any officer misconduct may have occurred and, if misconduct is suspected, recommends that the SIU conduct an investigation. (Cheverko Aff. ¶ 7;

Pietranico Dep. at 17-19; Exhibit M to Mendoza Dep. ("Simmons Dep.") at 28, 39-40 (ECF No. 77-13).) When SIU investigation requests are made, the Deputy Commissioner briefs the Commissioner, who approves the investigation requests as appropriate. (Cheverko Aff. ¶ 8.)

The SIU conducts various investigations into matters such as alleged violations of the DOC Code of Conduct, including use of force incidents. (Ex. 13 to Adin Aff. (ECF No. 71-28).) During the relevant period, the SIU was run by Captains Cusma and Moccio, who assigned lead investigators for specific investigations. (Pietranico Dep. 20, 25). The SIU is overseen by one of the Deputy Commissioners—Deputy Commissioner Pruyne during the relevant time period (Petranico Dep. at 15.)

DOC typically denies salary increments to COs with pending SIU investigations. (Pietranico Dep. at 49-50; Defs' SUMF ¶ 56; Pl.'s CSDMF ¶ 56.) Each quarter, SIU provides the Commissioner with a list of individuals under investigation so the Commissioner can identify increments to withhold. (Defs' SUMF ¶ 58; Pl.'s CSDMF ¶ 58.) Any denial of a salary increment is to be communicated, in writing, to an officer at least thirty days prior to the increment due date to provide the officer with an opportunity to challenge the denial through contractual remedies. (Defs' SUMF ¶ 57; Pl.'s CSDMF ¶ 57.) Captain Cusma avers that from 2010 through 2020, six COs other than Plaintiff—four males and two females—were denied salary increments due to open SIU investigations. (Ex. 20 to Adin Aff. (ECF No. 71-37).)

Inmate assaults on staff are reported to the New York State Commission of Corrections. (Cheverko Aff. ¶ 20.) If warranted, assaulted officers may complete a supporting deposition, which is submitted by WCDCS to the Westchester County Department of Public Safety to determine whether to recommend that the District Attorney bring criminal charges against the inmate.

(Pietranico Dep. at 50; Ex. C to Mendoza Aff. ("Marable Dep.") at 35-36 (ECF No. 77-3); Ex. 10 to Adin Aff. ("Van Lierop Dep.") at 50-52 (ECF No. 71-25).)

## 2. **Plaintiff's Employment**

On or about September 14, 2015, Plaintiff began her employment as a DOC officer. (Ex. 2 to Adin Decl. (ECF No. 71-9); Defs' SUMF ¶ 1; Pl.'s CSDMF ¶ 1.) As a new officer, Plaintiff was required to serve a one-year probationary period. (Defs' SUMF ¶ 3; Pl.'s CSDMF ¶ 3.)

### a.    *Plaintiff's Work Restrictions*

In March of 2016, Plaintiff was involved in an off-duty car accident for which she missed several weeks of work and, upon her return, requested certain limitations on her job duties. (Defs' SUMF ¶¶ 4-5, 12; Pl.'s CSDMF ¶¶ 4-5, 12.) Because Plaintiff was seeking a light-duty restriction for an off-duty injury, she was required to get medical certification from the Occupational Health Center ("OHC") at the Westchester Medical Center. (Defs' SUMF ¶ 6; Pl.'s CSDMF ¶ 6.) Plaintiff received a certification from OHC and was granted a "light-duty" restriction, with limited inmate contact. (Ex. 5 to Adin Aff. (ECF No. 71-20); Defs' SUMF ¶ 8; Pl.'s CSDMF ¶ 8.) Plaintiff obtained renewal certifications from OHC in May, June, July, and August 2016, extending her light-duty restriction for 30 days each time. (Defs' SUMF ¶ 9; Pl.'s CSDMF ¶ 9; *see* Ex. D to Cheverko Aff. (ECF No. 71-5) and Ex A to Ex. 4 of Adin Aff. ("OHC Certifications") (ECF No 71-12).)

Plaintiff avers that she was repeatedly assigned to work in the 1-K cell block control room ("Control Room"), which was not limited or light-duty, which caused her union representative to submit a complaint to management on her behalf requesting that her post be appropriately changed. (Pltf. 49-52.) Plaintiff testified that she complained on at least one occasion that the Control Room was not light-duty and that her union representative agreed that the Control Room was not a light-

4

duty post and called a supervisor on Plaintiff's behalf. (Melendez Dep. at 50-52.) No records of these complaints were submitted to the Court.

An April 19, 2016 evaluation indicates that Plaintiff's performance was average or above average for all review categories. (Ex. G to Mendoza Aff. ("4/19/16 Performance Review") (ECF. No. 77-7).)

   *b. The June 16, 2016 Incident with an Inmate*

On June 16, 2016, Plaintiff was assigned to the Control Room. (Defs' SUMF ¶ 13; Pl.'s CSDMF ¶ 13.) During this assignment, an inmate on enhanced security protocol was scheduled to be transferred from the 1-G cell block to the 1-K cell block, which is directly across the hall. (Defs' SUMF ¶ 15; Pl.'s CSDMF ¶ 15.) Plaintiff testified that she left the Control Room because she thought she had to open the gate from 1-G. (Ex. 6 to Adin Aff. and Ex. L to Mendoza Aff. ("Melendez Dep.") at 64 (ECF Nos. 71-21, 77-12).) While Plaintiff was returning to the Control Room, the inmate grabbed or slapped Plaintiff's buttocks. (Defs' SUMF ¶ 16; Pl.'s CSDMF ¶ 16; *see also* Ex. K to Melendez Aff. ("SIU Investigation Report" (ECF No. 77-11) (describing video showing the inmate "slapping/touching Officer Melendez buttocks").) Plaintiff pushed the inmate away, and he was immediately taken to the ground by officers Moylan and Cucino. (Defs' SUMF ¶ 17; Pl.'s CSDMF ¶ 17.) Plaintiff pulled her body alarm and called in additional assistance to restrain the inmate. (Defs' SUMF ¶¶ 18-19; Pl.'s CSDMF ¶¶ 18-19.) Plaintiff avers that the two other officers did not succeed in restraining the inmate and he was overpowering them until Plaintiff assisted them by putting her knee in the inmate's back. (Melendez Dep. at 65-67.)

The Emergency Response Team ("ERT")—which was led that day by Sergeant Simmons (Simmons Dep. 51)—then arrived on the scene and took control. (Defs' SUMF ¶ 20; Pl.'s CSDMF ¶ 20.) While ERT had control of the inmate, who was restrained and cuffed on the floor, the inmate continued to make vulgar comments. (Defs' SUMF ¶ 21; Pl.'s CSDMF ¶ 21.) Plaintiff admits that

5

she responded to the inmate with profanity and threw a pair of latex gloves toward his face. (Melendez Dep. at 70-71, 176; Defs' SUMF ¶ 22; Pl.'s CSDMF ¶ 22.) However, Plaintiff testified that she was in shock and was acting without thinking and that having just been sexually assaulted made her actions less inappropriate. (Melendez Dep. at 167, 168.)

    *c.    Response to the Incident*

        i. Verbal Counseling

Immediately after the incident, Sergeant Natasha Van Lierop pulled Plaintiff into the Control Room and verbally counseled her that her behavior—including throwing latex gloves at an inmate—was inappropriate. (Van Lierop Dep. at 34, 66, 68-69 (ECF No. 71-25); Defs' SUMF ¶¶ 23, 25; Pl.'s CSDMF ¶¶ 23, 25.) Plaintiff informed Sergeant Van Lierop that the inmate touched her inappropriately and the Sergeant directed Plaintiff to file a disciplinary report. (Van Lierop Dep. at 36-37.) Plaintiff testified that she told Sergeant Van Lierop that she was just sexually assaulted and was "very frantic" and did not remember everything that happened. (Melendez Dep. at 73, 78.) Sergeant Van Lierop denies that Plaintiff indicated that she was in shock or that she did not remember the details of the incident. (Van Lierop Dep. at 68.)

Sergeant Van Lierop prepared a written report to Captain Marable wherein she memorialized that on June 16, 2016 she had verbally counseled Plaintiff regarding her unprofessional behavior. (Ex. 11 to Adin Aff. (ECF No. 71-26).) Sergeant Van Lierop also wrote a memorandum to Deputy Commissioner Diaz describing Melendez's conduct. (Ex. 12 to Adin Aff. (ECF No. 71-27; Defs' SUMF ¶ 27; Pl.'s CSDMF ¶ 27.)

Plaintiff acknowledges that, if the use of profanity was reported, the Code of Conduct required the SIU to investigate the incident. (Defs' SUMF ¶ 29; Pl.'s CSDMF ¶ 29.) However, Plaintiff avers that her use of profanity was not formally reported; rather Sergeant Van Lierop had

merely given her a verbal warning. (Melendez Dep at 176-77.) Plaintiff further testified that her conduct was justified by having just been sexually assaulted. (Melendez Dep. at 176.)

ii. Use of Force Reports

Sergeant Simmons submitted an Alarm or Incident Response Narrative Report: Supervisor's Report regarding the June 16, 2016 incident, which states in relevant part that "[w]hile Officer Michelle Melendez #1413 was exiting the block the inmate began yelling and cursing at her to which she replied with a comment which I could not hear clearly." (Ex. 26 to Supp. Adin Aff. (ECF No. 75-4).)

The day of the incident, Plaintiff filled out a Use of Force report, which mentions that the inmate "slapped/grabbed" her rear end and that she responded by "striking him." (Ex. 7 to Adin Aff. ("Melendez UOF Rpt.") (ECF No. 71-22).) The same day, Sergeant Van Lierop also filled out a Use of Force Report, which only mentions Plaintiff to the extent that when asked what occurred, the officer "stated that while moving [the inmate]. . . he touched/hit Officer Michelle Melendez." (Ex. 9 to Adin Aff. (ECF No. 71-24).)

The Use of Force reports were reviewed internally by the Use of Force Review Board ("UOFRB"). (Defs' SUMF ¶ 40; Pl.'s CSDMF ¶ 40.)

iii. Plaintiff's Sexual Assault Complaints

On or about June 18 or 20, 2016, Plaintiff completed a supporting deposition indicating that the incident caused her physical and psychological injury, so that the Westchester County Department of Public Safety ("WCDPS") could investigate potential criminal charges against the inmate. (Ex. 14 to Adin Aff. (ECF No. 71-29); Defs' SUMF ¶ 32; Pl.'s CSDMF ¶ 32.) Detective Peters of the WCDPS avers that he reviewed Plaintiff's supporting declaration and other materials in the course of his investigation and provided all relevant information to the District Attorney's

7

Office but they did not bring criminal charges against the inmate. (Ex. 16 to Adin Aff. (ECF No. 71-31).) Plaintiff testified that WCDPS never contacted her about the investigation. (Melendez Dep. at 95.) Plaintiff's counsel submitted a Freedom of Information request to the New York State Commissioner of Correction seeking copies of public records pertaining to Plaintiff's deposition against the inmate and was told by a records officer that there were no responsive records. (Ex. N. to Mendoza Aff. (ECF No. 77-4).)

iv. Plaintiff's Injury Documentation

Captain Marable—the shift commander during the incident—reviewed Plaintiff's supporting deposition—wherein she alleged she was physically touched by an inmate which caused her physical and psychological injury—and provided her a job injury packet. (Ex. 15 to Adin Aff. (ECF No 71-30); Defs' SUMF ¶ 33; Pl.'s CSDMF ¶ 33.) On June 19, 2016, Captain Marable alerted Deputy Commissioner Diaz that she had directed Plaintiff to submit the job injury forms and when, on June 22, 2016, Deputy Commissioner Diaz alerted Captain Yankowsi that Plaintiff would be submitting the forms, Deputy Commissioner Diaz noted "I have yet to see a final UOF report but there was also a question as to her needing to get involved." (Ex. 23 to Adin Supp. Aff. (ECF No. 75-1).) Deputy Commissioner Pruyne, who had been copied on the email to Captain Yankowski, then forwarded the emails as well as the verbal counseling memo to the UOFRB members.

Plaintiff submitted a Notice of Claim and an Employee Incident & Illness Report, and her supervisor, Sergeant Kendell Middleton, also submitted an Employee Incident & Illness Report and a Preliminary Employee Injury Investigative Report, which indicate the Plaintiff injured her back and knee when she assisted the other officers in restraining the inmate but that she remained on duty and did not receive medical treatment. (Exs. B, C, D, E to Yankowski Aff. (ECF Nos. 71-

8

13, 71-14, 71-15, 7-16).) One of the two other COs who Plaintiff assisted to subdue the inmate was also injured in the incident and filled out an injury report. (Ex. J to Mendoza Aff. ("Cucino Injury Rpt.") (ECF No. 77-10).)

The Attendance Management Unit—which Captain Yankowsi runs—submitted Plaintiff's Employer's First Report of Work-Related Injury/Illness form to the State of New York Workers' Compensation Board. (Ex. F to Ex. 4 of Adin Aff. (ECF No 71-17).) Captain Yankowski avers that his office opened a file for Plaintiff's work-related injury claim but that it was labeled "Record Only" because "no additional action would be taken unless and until Melendez missed time or obtained treatment that she identified as in connection with the work-related injury." (Ex. 4 to Adin Aff. ("Yankowski Aff.") ¶ 8.) Captain Yankowski further avers that "[a]t no time was Melendez on [(job injury ("JI")] status. In order to be considered for JI status, an employee must obtain treatment in connection with a work-related injury and provide her workers' compensation claim number to the treating physician to allow the bills for the treatment to be submitted. No bills for treatment of Melendez were ever submitted to the Workers' Compensation Board or to . . . WCDOC's workers' compensation administrator." (Yankowski Aff. ¶ 9; *see also* Cheverko Dep. at 90-91 (stating that Plaintiff was never on job injury status).)

In August 2016, Plaintiff submitted a special report with a note from her doctor alerting the Department that she continues to take pain medication for injuries related to her car accident and does not mention any job-related injury. (Ex. G to Yankowski Aff. ("Special Report") (ECF No. 71-18).)

### v. Discipline of the Inmate

Immediately following the incident, the inmate was placed on "keep lock" status—meaning that he was confined to his cell throughout the day, other than certain mandated periods.

(Defs' SUMF ¶¶ 49-50; Pl.'s CSDMF ¶¶ 49-50.) A number of disciplinary reports were written regarding the inmate's conduct on June 16, 2016, including by Plaintiff. (Ex. 8 to Adin Aff. (ECF No. 71-23).) Per DOC policy, these reports were referred for a disciplinary hearing. (Defs' SUMF ¶ 48; Pl.'s CSDMF ¶ 48.) On July 8, 2016, Captain Conway presided over the discipline of the inmate, which was resolved by plea bargain under which the inmate was required to serve 180 days on keep lock status, and assessed a surcharge of $75—the maximum surcharge and keep lock time permitted by state regulations and DOC policy for the offenses with which the inmate had been charged. (Ex. 19 to Adin Aff. ("Conway Aff.") (ECF No. 71-34); Defs' SUMF ¶¶ 51-52; Pl.'s CSDMF ¶¶ 52-52.)

The incident with the inmate was also reported to the New York State Commission on Correction. (Ex. F. to Cheverko Aff. (ECf No. 71-7); Defs' SUMF ¶ 34; Pl.'s CSDMF ¶ 34.)

Captain Marable admitted that she was aware that later on June 16, 2016, the inmate had to be restrained and pepper sprayed, that the deployment of pepper spray is use of force and a use of force report should have been submitted but that she was not aware whether one was. (Marable Dep. at 98, 101-03.)

### vi. SIU Investigation

On July 6, 2016, Assistant Warden Moccio sent a memorandum to the UOFRB Captain describing the facts underlying the incident and recommending a formal SIU investigation. (Ex. A to Cheverko Aff. (ECF No. 71-2); Defs' SUMF ¶¶ 41-42; Pl.'s CSDMF ¶¶ 41-42.) The memorandum states that an investigation is warranted "[d]ue to the suspicious facts surrounding the job injury of Officer Melendez and the possibility that she is falsifying a job injury claim," where she left the Control Room to assist with an inmate even though she was on light duty and "[o]nce the inmate was restrained Officer Melendez left her post (while on light duty), used

physical force against the inmate and submitted a claim for a job injury two days after the incident," and Melendez's use of force report omitted that she had engaged in unprofessional behavior. (Ex. A to Cheverko Aff. (ECF No. 71-2).)

On July 22, 2016, the UOFRB Captain transmitted that memorandum to Commissioner Cheverko, requesting approval for an investigation, which the Commissioner gave. (Ex. A to Cheverko Aff. (ECF No. 71-2).) The request notes both that the inmate physically touched Melendez and that Melendez "may have committed misconduct by throwing a pair of latex gloves at the inmate." (*Id.*; Defs' SUMF ¶¶ 43-44; Pl.'s CSDMF ¶¶ 43-44.)

On August 4, 2016, Sergeant Johnson was assigned to lead the SIU investigation into whether Melendez violated the Code of Conduct. (Defs' SUMF ¶ 45; Pl.'s CSDMF ¶ 45.) As part of that investigation, Sergeant Johnson and Sergeant Pietranico, interviewed Officers Moylan, Cucino, and Melendez, as well as Sergeant Van Lierop. (Defs' SUMF ¶ 46; Pl.'s CSDMF ¶ 46.)

Plaintiff avers that she learned that she was under SIU investigation when she was interviewed by Sergeant Johnson and Sergeant Pietranico. (Melendez Dep. at 86-87.) The record indicates that the interview occurred on August 24, 2016. (Ex. 18 to Adin Aff. (ECF No. 71-34).) Plaintiff testified that during the interview she was asked "[a]bout what [she] did during the sexual assault." (*Id.* at 89.)

When Sergeant Johnson learned that Melendez resigned, she closed the investigation without further action or findings. (Ex. 18 to Adin Aff. (ECF No. 71-33); Defs' SUMF ¶ 47; Pl.'s CSDMF ¶ 47.)

   d.   *Denial of Plaintiff's Salary Increment*

Plaintiff testified that at the end of the interview with Sergeant Johnson and Sergeant Pietranico on August 24, 2016, she was notified that she would be denied the salary increment. (*Id.* at 90.) The notice letter—dated August 22, 2016 and signed by Commissioner Cheverko—

11

advised Plaintiff that, due to the open SIU investigation, she would be denied her salary increment that would otherwise be due on October 1, 2016, and the increment would "be subject to re-review in the following quarter." (Ex. B. to Cheverko Aff. (ECF No. 71-3); Defs' SUMF ¶ 54; Pl.'s CSDMF ¶ 54.)

Plaintiff testified that she believed she was being denied the increment as punishment for being sexually assaulted and asked Sergeant Johnson and Sergeant Pietranico whether that was the case. (*Id.* at 89, 169.) Commissioner Cheverko avers that the salary increment was denied due to the ongoing SIU investigation and denies that Plaintiff's salary increment was withheld because of the June 16 incident or Plaintiff's complaints that the inmate had sexually assaulted her. (Cheverko Aff. ¶¶ 11, 20-21).

     *e.*     *Plaintiff's Evaluation and Termination*

Plaintiff's probationary period was set to expire on September 12, 2016. (Defs' SUMF ¶ 60; Pl.'s CSDMF ¶ 60.) On August 31, 2016, Deputy Commissioner Justin Pruyne informed Commissioner Cheverko that two probationary officers were on light-duty status and that while one correction officer's light-duty status would expire before the end of his probationary period, Plaintiff's light-duty status would need to be extended past the end of her probationary period. (Ex. C. to Cheverko Aff. ("Pruyne Email") (ECF No. 71-4); Ex. H to Yankowski Aff. (ECF No. 71-19); Defs' SUMF ¶ 61; Pl.'s CSDMF ¶ 61.) Deputy Commissioner Pruyne noted that Commissioner Cheverko "may wish to consider terminating Officer Melendez's employment status similar to [a former probationary officer who] was terminated pursuant to Rule 11 based upon his inability to proceed to full-duty prior to the end of his probationary term (which was never challenged in court)." (Pruyne Email.)

Commissioner Cheverko avers that there is a limited number of posts with limited inmate contact—some of which are allocated by contract with the union—and the remaining positions for

duty restrictions are prioritized for employees with restrictions from job-related injuries. (Cheverko Aff. ¶ 15; Cheverko Dep. at 89.) Commissioner Cheverko avers that he decided to terminate Plaintiff based on her failure to progress to full duty prior to the end of the probationary period and testified that had she had an approved job injury claim she would not have been terminated. (Cheverko Dep. at 92-93; Cheverko Aff. ¶¶ 16-17.) He further avers that at the time he terminated Plaintiff he was aware of the June 16 incident and that Plaintiff had violated her light-duty order by coming out of the control room and interacting with an inmate and behaved inappropriately toward that inmate, and the ensuing investigation. (Cheverko Dep. at 83, 96-99, 103-04; Cheverko Aff. ¶ 17.) Commissioner Cheverko testified that "she would have been terminated by virtue of not progressing to fully duty status regardless of the incident." (Cheverko Dep. at 99, 103.) As to the role of the incident in the termination, Cheverko testified both that "part of the reason that she was terminated" was that as an injured person on light-duty she placed herself in an inmate-facing situation and that "the fact that she left the control center to confront the inmate, [was] not part of the decision, but it was considered." (Cheverko Dep. at 99, 103.) He further avers that during his eight years as Commissioner, he failed the probation of a male officer for failure to progress to full duty. (Cheverko Aff. ¶ 18 (at least one prior occasion); Cheverko Dep. at 86 (one prior case)).

On September 1, 2016, Sergeant Simmons filled out an evaluation form for Plaintiff, giving her mostly "average" and "below average" grades, and noted "Officer Melendez has had very limited opportunities to show how she responds to an emergency situation however in the one occasion that I was involved in she seemed to be emotionally distressed and acted unprofessional. She ultimately received a verbal counseling for her actions." (Ex. H to Mendoza Aff. ("9/1/16 Evaluation") (ECF No. 77-8); Simmons Dep. 41-42.) He testified that he could not recall whether

Plaintiff's file had any corrective action forms or whether he checked Plaintiff's file for corrective action forms before he filled out the evaluation. (Simmons Dep. at 32, 36.) Sergeant Simmons further testified that a shift commander assigned him to complete the evaluation but that he did not recall which commander or when. (Simmons Dep. 32.)

By letter dated September 1, 2016, Commissioner Cheverko informed Plaintiff that her termination would be effective September 8, 2016, and that she was no longer required to report for duty. (Ex. E. to Cheverko Aff. ("Termination Letter") (ECF No. 71-6); Defs' SUMF ¶ 67; Pl.'s CSDMF ¶ 67.) Plaintiff testified that she learned of her termination by phone because she was traveling out of state when the termination letter was delivered to her house. (Melendez Dep. 95-98.) Commissioner Cheverko testified that "[t]he rule is not to notify a probationary officer why they are being terminated." (Cheverko Dep. at 119.) The president of Plaintiff's union subsequently reached out to the Commissioner and asked that she be allowed to resign in lieu of termination. (Cheverko Aff. ¶ 23; Defs' SUMF ¶ 68; Pl.'s CSDMF ¶ 68.) Commissioner Cheverko agreed to the request, and Plaintiff resigned in lieu of termination. (Ex. G. to Cheverko Aff. (ECF No. 71-8); Defs' SUMF ¶ 68; Pl.'s CSDMF ¶ 68.) Plaintiff avers that neither she nor her union representative were ever told why Plaintiff was being terminated. (Melendez Dep. at 97-98, 101, 187.)

In or around March 2018, in response to a reference check from the New York Court System, DOC indicated that Plaintiff had resigned "during a pending investigation" and the DOC would not rehire her. (Ex. F to Medoza Aff. ("WCDS Resp. to N.Y. Courts") (ECF No. 77-6); Pietranico Dep. at 41-42.) Plaintiff testified that the New York Court System told her that she did not get the job because of this reference from DOC. (Melendez Dep. at 111.)

### 3.  Procedural History

On October 3, 2016, Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC") alleging, inter alia, that Defendants retaliated against her for filling out the necessary paperwork to initiate outside charges against an inmate for sexual assault. (Ex. D. to Adin. Aff. in Supp. of Mot. to Dismiss ("EEOC Charge") (ECF No. 39-4).) Defendants responded to the EEOC charge by letter dated May 5, 2017. (Ex. D to Mendoza Aff. (ECF No. 77-4).) The EEOC issued Plaintiff a right to sue letter on August 31, 2017. (Ex. B. to Mem. in Supp. of Mot. to Dismiss (ECF No. 41-2.)

Plaintiff initiated this action on December 7, 2017 against Darren Ayotte, Kevin M. Cheverko, County of Westchester, Westchester County Correction Officers Benevolent Association, Inc., Westchester County Correction Officers Union, Inc., Westchester County Department of Corrections Superior Office, and Westchester County Department of Public Safety Services Benevolent Association. (ECF No 10.) Plaintiff voluntarily dismissed claims against Darren Ayotte and Westchester County Correction Officers Benevolent Association, Inc. (ECF Nos. 29, 32.) By order dated January 16, 2019, the Court dismissed Plaintiff's claims for disability-based discrimination and retaliation under the Americans with Disabilities Act and New York State law, sex-based discrimination under Title VII, tortious interference under New York State Law, and Section 1983 based on a due process violation . (ECF No. 42.) Following Defendants' motion for reconsideration, the Court dismissed Plaintiff's claims for sex-based discrimination and retaliation under New York law. (ECF No. 45.) Defendants filed answers to the two remaining claims—Title VII retaliation and Section 1983 Equal Protection claims (ECF No. 46)—in Plaintiff's amended complaint (ECF No. 31). Following discovery, Defendants filed the instant motion for summary judgment seeking dismissal of the remaining claims. (ECF Nos. 70-79.)

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted*." Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

"In cases based on allegations of [discrimination and] discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment

'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'" *Thompson v. Morris Heights Health Ctr.*, No. 09 Civ. 7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006)). However, "'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown,* 257 F.3d at 252 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal citations omitted). "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. *Gross v. Nat'l Broad. Co.*, 232 F.Supp.2d 58, 67 (S.D.N.Y. 2002); *see also Risco v. McHugh*, 868 F.Supp.2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and] 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005))).

## DISCUSSION

Defendant moves to dismiss both of Plaintiff's remaining claims: retaliation and denial of equal protection under Section 1983. The Court will address each claim in term.

## I.  Retaliation

### A.  Legal Standard

Title VII forbids an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In other words, only complaints "with respect to the terms and conditions of employment" are "protected activity" upon which a retaliation claim can be based. *Wimmer v. Suffolk Cnty. Police Dep't,* 176 F.3d 125, 135 (2d Cir.1999). Title VII requires plaintiffs to first exhaust their administrative remedies before filing suit in federal court. *See* 42 U.S.C. § 2000e-5(f)(3). Exhaustion demands timely filing of charges with the EEOC and receipt of a notice of right to sue. *Id.*; *see also Williams v. N.Y. Hous. Auth.*, 458 F.3d 67, 69-70 (2d Cir. 2006).

Title VII retaliation claims are evaluated under the burden-shifting framework established in *McDonnel Douglas v. Green*, 411 U.S. 792 (1973). *Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932-33 (2d Cir. 2010) (per curiam). First, the plaintiff must make a *prima facie* case: (1) that she engaged in a protected activity; (2) that the defendant knew she engaged in a protected activity; (3) that the defendant took an adverse employment action against her; and (4) that there was a causal connection between Plaintiff's protected activity and the adverse employment action. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). The plaintiff's burden of proof at this stage is *de minimis. Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) (describing burden as "minimal").

Once a plaintiff has made a *prima facie* case, the burden then shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas,* 411 U.S. at 802. Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the *prima facie* case "drops from the

18

picture," *Weinstock,* 224 F.3d at 42 (citing *Hicks,* 509 U.S. at 510-11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that "defendant's reason is in fact [a] pretext for unlawful discrimination," *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015); *accord McDonnell Douglas,* 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted) (citation omitted).

### B. *Application*

As a preliminary matter, Plaintiff's retaliation claim is limited to the charge she lodged in her EEOC complaint, namely that Defendants retaliated against her "after filing sexual-assault related charges." While Defendants effectively concede that the increment denial and termination[2] are adverse employment actions, Plaintiff's retaliation claim cannot survive summary judgment for two reasons: (1) Plaintiff's complaints of sexual assault are not protected activity; and (2) Plaintiff has failed to adduce any evidence from which a reasonable jury could find that Defendants' proffered justifications are pretextual and they would not have taken adverse action against her but for her sexual assault and complaint thereof.

### 1. Protected Activity

In order to qualify as a protected activity, a plaintiff must have complained not just that some discrimination occurred in the course of the plaintiff's employment but that the discrimination was related to an "employment practice." *Kelly v. Howard I. Shapiro & Assocs.*

---

[2] Although Defendant ultimately allowed Plaintiff to resign in lieu of termination, Defendant concedes for purposes of this motion that Plaintiff was constructively discharged. (Mem. in Supp. at 1 n1.) For simplicity, the Court will refer to Plaintiff's separation as "termination."

*Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). For example, a black police officer who "reported overhearing racial slurs made by [other] police officers against black citizens" had not engaged in protected activity despite "opposing discrimination by co-employees against non-employees" because his "opposition was not directed at an unlawful *employment practice* of his employer." *Wimmer,* 176 F.3d at 135; *accord Salas v. N.Y.C. Dep't of Investigation*, 298 F. Supp. 3d 676, 686 (S.D.N.Y. 2018) (holding that an officer's complaints to her employer that her co-workers mistreated Hasidic visitors to the Division not protected activity under Title VII and cannot form the basis of a retaliation claim). Similarly, a teacher who complained that another teacher discriminated against a student was not opposing discrimination in an employment practice and therefore had not engaged in protected activity that could form the basis of a retaliation claim. *Saliba v. Five Towns Coll.*, 991 F. Supp. 2d 449, 451 (E.D.N.Y. 2014). It follows that a complaint that a non-employee discriminated against a plaintiff is similarly not a complaint about an employment practice unless the plaintiff provides some evidence to impute the discrimination by the non-employee to the employer. In other words, "to fall within Title VII's protection, an employee's 'opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.'" *Braham v. N.Y. Unified Court System,* No. 94 Civ. 2193, 1998 WL 107117, at *3 (S.D.N.Y. Mar. 11, 1998) (quoting *Silver v. KCA, Inc.,* 586 F.2d 138, 142 (9th Cir. 1978)).

Here, Plaintiff avers that she engaged in protected activity when she complained that the inmate sexually assaulted her.[3] Thus, to the extent that Plaintiff argues that she engaged in

---

[3] Defendant reads Plaintiff's EEOC charge more narrowly to cover only the supporting deposition Plaintiff completed to initiate a criminal investigation. However, "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint," *Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir. 1989); so the Court will consider both the supporting deposition and the internal complaints. *See Kotcher,* 957 F.2d at 64 (internal complaint to company management was protected activity).

protected activity by complaining that the inmate sexually assaulted her, she "must show sufficient facts to impute the actions of the non-employee to her employer." *Flower v. Mayfair Joint Venture*, No. 95 CIV. 1744 (DAB), 2000 WL 272187, at *10 (S.D.N.Y. Mar. 13, 2000) (citing *Folkerson v. Circus Circus Enter., Inc.,* 107 F.3d 754, 756 (9th Cir. 1997) (finding that casino employee had failed to show any facts suggesting that employer ratified or acquiesced in casino patron's alleged sexual harassment, thereby defeating her retaliation claim)).

Defendants admit that the inmate touched Plaintiff inappropriately, but they aver that Plaintiff has nonetheless failed to adduce any evidence imputing the inmate's behavior to Defendants. The Court agrees. In fact, the record demonstrates that after the inmate inappropriately touched Plaintiff, he was placed on "keep lock" status and disciplined. (Conway Aff. ¶ 7); Defs' SUMF ¶¶ 49-52; Pl.'s CSDMF ¶¶ 49-52.) The incident with the inmate was also reported to the New York State Commission on Correction. (Defs' SUMF ¶ 34; Pl.'s CSDMF ¶ 34.)

To the extent Plaintiff claims that Defendants are liable for the inmate's assault on her because no criminal charges were filed against him, the record belies that this is Defendants' fault. Detective Peters of the WCDPS avers that Defendants referred Plaintiff's complaint against the inmate to his office, and that he reviewed Plaintiff's supporting declaration and other materials in the course of his investigation and provided all relevant information to the District Attorney's Office. In sum, Plaintiff did not engage in a protected activity because she did not complain about any employment practice.

### 2. Pretext

Even if Plaintiff's complaint of sexual assault by an inmate were protected activity, her retaliation claim would nonetheless fail because she has not adduced evidence from which a reasonable jury could determine that Defendants' proffered justifications for denying the salary

increment and terminating her are pretextual in that she would not have suffered these adverse actions but for her sexual assault and claim thereof.

### a. Increment Denial

Defendants aver that pursuant to general practice, the increment was denied because of the pending SIU investigation, an investigation that was legitimately underway because of allegations that during the June 16, 2016 incident Plaintiff, who was on light-duty status with limited inmate contact, left her post resulting in her use of force on an inmate and then behaved inappropriately by throwing rubber gloves at and speaking inappropriately to the inmate.

Plaintiff has adduced no evidence other than a temporal connection that being sexually assaulted or reporting that assault resulted in her salary increment denial and subsequent termination. While "temporal proximity can demonstrate a causal nexus . . . . Where timing is the only basis for a claim of retaliation . . . an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) (ADEA retaliation); *accord Pena-Barrero v. City of New York*, 726 F. App'x 31, 35 (2d Cir. 2018) (holding Plaintiff failed to demonstrate that he was retaliated against for bringing a prior legal action where his only evidence was that less than one month elapsed between the settlement of the prior suit and his termination.)

### b. Termination

Defendants aver that Plaintiff was terminated because she failed to progress to full status by the end of her probationary period. Plaintiff admits that she has no direct evidence of the motivation for her termination and the fact that she was not provided with a reason for her termination "does not give rise to an inference that the unstated reason was discriminatory." *Mingguo Cho v. City of New York*, 549 Fed. App'x 15, 18 (2d Cir. 2013). Because she lacks any

direct evidence, Plaintiff attempts to discredit Defendants' justification for terminating her because: (1) she aggravated her back injury during the restraint of the inmate and therefore was not on continued light-duty status solely because of an out-of-work injury; (2) Defendants' "purported inability" to provide her with light-duty posts in perpetuity "defies logic"; (3) a negative performance evaluation was written on the same day the decision was made to terminate her; (4) the email from Deputy Commissioner Pruyne to Commissioner Cheverko recommending termination purportedly indicates that Plaintiff should be terminated because she reported sexual assault; and (5) Defendants reported to a potential employer that she resigned during a pending investigation. (Pl. Opp. 14-16). Defendants are correct that none of these claims has support in the record or raises a dispute of material fact as to pretext.

First, there is simply no evidence that the extension of Plainitff's light-duty status was required because of injuries sustained or exacerbated during the incident with the inmate. The medical records regarding Plaintiff's need for light-duty subsequent to the June incident is in the form of certification forms for non-work related injuries signed on June 20, 2016, July 19, 2016, and August 25, 2016 by OHC—which only handles out-of-work injuries (Cheverko Aff. ¶ 22)— and none of these forms indicate why Plaintiff's light-duty status should be continued. Additionally, the special report Plaintiff submitted on August 3, 2016, which was accompanied by a doctor's note, indicates that Plaintiff continues to take certain pain medication "due to the major car accident I was involved in" without any mention of the June 16 incident. (Special Report; OHC Certifications.) Finally, both Captain Yankowski and Commissioner Cheverko aver that Plaintiff was never on JI status. (Cheverko Aff. ¶ 22; Yankowski Aff. ¶ 9.) Accordingly, no reasonable jury could find that Plaintiff's continued light duty was the result of work-related injury.

Second, even if Plaintiff were correct that the "light-duty" assignments she was given were not compliant with her restrictions—which Plaintiff suggested during testimony but has provided no evidence for—that there are few light-duty positions available gives more not less credence to Commissioner Cheverko's testimony that light-duty positions are limited and priority is given to those with on the job injuries. (Cheverko Aff. ¶ 15; Cheverko Dep. at 89.) Additionally, neither the fact that Commissioner Cheverko only terminated one other employee for failing to progress to full status by the end of the probationary period nor the fact that Deputy Commissioner Pruyne reminded the Commissioner that such an approach was possible is sufficient to raise a dispute as to whether that justification was pretextual.

Third, neither the fact that the negative performance review was dated the same day as the termination letter nor Sergeant Simmons's testimony regarding his preparation of that review are sufficient to demonstrate pretext. Dismissals are often preceded by adverse performance reviews" even if "it was given on the eve of the" termination. *Viola v. Phillips Medical Sys. of N. Am.*, 42 F.3d 712, 718 (2d Cir. 1994). Moreover, Plaintiff has adduced no evidence that Commissioner Cheverko requested Sergeant Simmons's review or relied upon it in his termination decision.

Fourth, contrary to Plaintiff's contention, the August 31, 2016 email from Deputy Commissioner Pruyne to Commissioner Cheverko does not mention the sexual assault. It states "[n]otwithstanding the pending SIU investigation into a use of force incident, you may wish to consider terminating Officer Melendez's employment status" as was done with a male probationary officer who did not proceed to full duty by the end of the probationary period. (Pruyne Email.) Not only does this email provide corroboration for Commissioner Cheverko's stated reason for terminating plaintiff, but the opening clause is most naturally read to suggest not that Plaintiff should be fired because of the assault or even the investigation of it, but that because of

24

the failure to progress, Commissioner Cheverko need not wait for the conclusion of the SIU investigation to terminate Plaintiff.

Finally, the March 9, 2018 job reference provided to the New York Court System, which indicates that Plaintiff resigned while an investigation was pending does not demonstrate pretext. The manner in which DOC filled out a form years after Plaintiff was terminated does not demonstrate what motivated her termination when it occurred. It is plainly the case that at the time that Plaintiff was terminated, the SIU investigation was still pending.

Thus, even if failure to advance to full status were not the sole reason, Plaintiff has failed to produce evidence that she would not have been terminated but for the sexual assault and her reports thereof.

In sum, Plaintiff has failed to adduce sufficient evidence from which a reasonable jury could find that Defendants took adverse employment actions against her in retaliation for engaging in protected activity. Accordingly, Defendants have demonstrated entitlement to summary judgment in their favor on Plaintiff's retaliation claim.

## II.     Section 1983 Equal Protection Claim

We now turn to Plaintiff's claim under Section 1983 that Defendants violated her equal protection rights. Defendants aver that Plaintiff has failed to adduce evidence upon which a reasonable jury could find that the adverse actions of denial of salary increment denial and termination would not have occurred but for her gender. The Court agrees.

### A.  Legal Standard

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). "In order to establish individual liability

under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free School Dist.*, 365 F.2d 107, 122 (2d Cir. 2004). Additionally, "[i]n this Circuit personal involvement of defendants in the alleged deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977); *Fiengold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).

As to equal protection claims, "[t]raditionally, the Equal Protection Clause of the Fourteenth Amendment protects against [classification-based] discrimination." *Goldfarb v. Town of West Hartford*, 474 F.Supp.2d 356, 366 (D. Conn. 2007) (internal quotation marks omitted). The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To maintain an equal protection claim, a plaintiff must "show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as . . . sex." *Miner v. Clinton Cnty.*, 541 F.3d 464, 474 (2d Cir. 2008). In other words, to demonstrate that she was subject to disparate treatment, Plaintiff must show that she was treated "less favorably" than a similarly situated employee outside her protected group. *Graham v. Long Island R.R.*, 230 F.3d. 39 (2d. Cir. 2000). The Second Circuit has clarified that comparators must be "similarly situated" in "all material respects." *Id.*

Like Title VII claims, employment discrimination claims brought under Section 1983, alleging employment discrimination are evaluated using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). "While a plaintiff claiming disparate treatment under either statute must plausibly allege that she suffered an 'adverse employment action' taken 'because of' her sex . . . a

plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment" *Id.* at 212, 214. In other words, "to establish 'pretext' under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action. In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 215.

### B.  Application

Plaintiff has failed to make a prima facie case that Defendants violated her equal protection rights where the record is void of any evidence that the increment denial or the termination would not have occurred but for her gender.

First, as to the salary increment denial, the record demonstrates that in addition to Plaintiff, four male and two female COs had increments denied when they were the subject of a pending SIU investigation. (Ex. 20 to Adin Aff.) Plaintiff has adduced no evidence to refute this fact. She has also failed to adduce any evidence demonstrating that gender played a role in the decision to deny her increment or that any male COs under SIU investigation was similarly situated to Plaintiff and did not have an increment denied. Accordingly, she has failed to demonstrate that she was denied a salary increment because she is female.

Second, as to termination, the record demonstrates that on at least one other occasion, a male officer failed his probationary period because he failed to progress to full duty. Plaintiff seems to admit this fact but avers that she was nonetheless discriminated against on the basis of gender because one of the other officers involved in the incident with the inmate was a male officer who was also on probation and that he was not subsequently investigated or terminated. The record demonstrates that Plaintiff is the only officer alleged to have violated her light-duty order by

leaving her post to interact with an inmate, or to use profanities toward or throw latex gloves at the inmate. Accordingly, since she was the only officer involved in the incident alleged to have misbehaved, she is not similarly situated to the other officers involved, including the alleged male on probation, who were not accused of such misbehavior.[4]

Finally, to the extent that Plaintiff suggests that force was subsequently used against the same inmate later on June 16, 2016 but no use of force report was submitted, she has adduced no evidence beyond Captain Marable's acknowledgement that she heard that force was used and was not sure whether a use of force report had been submitted. Based on this limited information, no reasonable jury could conclude that the two incidents were handled differently on the basis of gender. Plaintiff has not adduced sufficient evidence from which a reasonable jury could find that she would not have suffered adverse employment actions but for her gender. Accordingly, based on the record, Defendants' motion for summary judgment dismissing Plaintiff's Section 1983 claim premised on the denial of equal protection must be granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment dismissing Plaintiff's remaining claims is GRANTED. The Clerk of Court is directed to enter judgment in Defendants' favor and to terminate the motion at ECF No. 70 and this action.

Dated:   February 8, 2021                         SO ORDERED:
         White Plains, New York

_____
          NELSON S. ROMÁN
        United States District Judge

---

[4] To the extent Plaintiff claims gender discrimination is evinced by the fact that no investigation resulted from a different incident in which force was used on The inmate, Plaintiff has adduced no evidence regarding the specifics of that incident or whether the COs involved therein were accused of mistreating the inmate as Plaintiff was.